Good morning everyone. The first case this morning is number 055136, Gemini Electronics against the United States. Mr. Miles. Your Honor and members of the court, good morning. I would like to go right to the gravamen and heart of this matter. I believe from the trial record there may be a little bit confusion so I have established a formula as to what I believe could explicate this matter a little bit better. A key figure in this case is Mr. JT Wicker. Wicker was the regional vice president for the United States Postal Service for the Great Lakes region and during the course of the trial as well as in the briefs his name has been mentioned on more than one occasion because he is a party that is in table to try and resolve this matter. First of all sometime between the months of June and September of 1999 Mr. Wicker the regional vice president of the United States Postal Service along with Mr. Rufus Porter who at that time was the Chicago district manager and Mr. Wilson who was the petitioner in this case met on more than one, two, three occasions to discuss a, to in fact discuss a contract, a contract with the Postal Service with Mr. Wilson as being one of the persons interested in the contract. During the course of those discussions it came to the fore that Mr. Wicker stated and informed Mr. Porter, his subordinate, in the meeting that he wanted Mr. Wilson to have the benefit of having his telephone service in the Great Lakes region not just the Chicago district. The trial testimony will reflect from Mr. Wilson, from Mr. Porter who were the principal participants in that meeting, that there was no question even the term was used in the record that the intent of Mr. Wicker was for Mr. Wilson to have the contract beyond the Chicago district for the Great Lakes region. I have divided up, Your Honors, in terms of before, then, and after because what is extraordinarily crucial to grasp here is at some point during the course of this litigation or prior to litigation, but during the course of what transpired, unfortunately, Mr. Wicker passed. He passed in January of 2000 and I believe a lot of the confusion in terms of who said what and what did or did not happen goes to the heart of that. But you know, even accepting or accepting that this is what the parties discussed, how do we get around the fact that it wasn't reduced to writing, that the attachment wasn't written or attached or communicated to Mr. Wilson? Well, let's back up just before October 21, 1999, it certainly was agreed upon by Mr. Wicker and by Mr. Porter and by Mr. Wilson. Mr. Wilson obviously presumed that that would be memorialized in the document on October 21, 1999, which was to be executed. As the court now knows, on October 21, 1999, there was no attachment aid which would have memorialized what the understanding of Mr. Wilson was. Mr. Porter said that the attachment was not there. Ms. Flynn said that the attachment was not there. Ms. Infanger, who was the lawyer for the Postal Service, said it was not there. Mr. Wilson presumed that the intent and the significance and meaning of his discussions with Mr. Wicker, who was the regional vice president, and by the way, had full authority to contract. It is undisputed in this record that Mr. Wicker had authority to contract. So when Mr. Wilson went- But Mr. Wicker didn't sign the contract. Mr. Porter did. Yes, he did, but he signed on behalf of- I'm sorry, Mr. Wicker signed on behalf- I'm pardon me, Mr. Porter signed on behalf of Mr. Wicker. It is the position of the petition in this matter, Mr. Porter was an agent for all practical purposes of Mr. Wicker. But Mr. Porter did not have any authority beyond the Chicago District. But certainly if, in fact, Mr. Wicker, who is his, in fact, superior, who is, in fact, the person in terms of land authority and land of responsibility that Mr. Porter answers to, if Mr. Wicker said to an employee, I want this to happen and this is what I want done, it is not unusual for an agent, you know, following the wishes and following the, in fact, the desires of a principal to say fine, Mr. Porter signed it, but Mr. Wicker and the trial- But Mr. Porter did not have the authority to bind beyond the Chicago District. Mr. Wicker might have had the authority, but Mr. Porter did not. Judge, I would, in fact, respectfully say I would disagree with that because the record reflects as follows. Ms. Infanger, who was the lawyer, who was the lawyer for the postal service, who was the person in charge of handling this contract matter, her testimony reflects when questioned by me during the course of the trial proceedings, whether or not Mr. Porter had the authority, she said, and when the question was put to her, she said I couldn't say that he didn't have the authority. As the record stands- Did he, in fact- Nobody has said- Mr. Myers, excuse me for a minute. Did he, in fact, have the authority? Pardon me? Did he, in fact, have the authority? Yes, he did. Because at that, yes, he did have the authority to say- The record does not reflect that, does it? Yes, well, Judge, the record, if, in fact, the record is looked at very carefully, and I'm sure that you have, what the record says from the lawyer from the postal service happened to say that, from her testimony, that Mr. Porter could sign it. Yeah, that's the statement- It has to be expressed authority, and we don't have it here, do we? Well, we don't have expressed authority because that, because the respondent's position is that there was nothing that they could point to during the entire course of this litigation. They gave them any authority to do it. Ms. Infanger said this was, as far as she was concerned, a case of first impression. She had never seen a, quote, contract like this. She called numerous other places to see whether other agencies within the postal service had had a contract like this, and she said that after making all of these calls, and to a multiplicity of districts, she could not find anything like this. And so when questioned during the trial court, in fact, proceedings, when she was asked about it, I mean, the question was that she could not say who had the authority, but she couldn't deny that Mr. Porter could do it as a Chicago district person, and even more importantly, he could do it specifically if, in fact, the principal, Mr. Weicker, for all practical purposes, said that he could do it. Now- Let's assume that there was a, at least a legitimate misunderstanding, that Mr. Wilson thought that he had broader authority. We have the conflicting evidence on the part of the government. Some say that they thought perhaps it was broader. Others insist that it was narrower, and we know that it never really got reduced to writing. I was trying to think about whether the premises of some sort of implied, in fact, contract could somehow benefit your client, and yet, as I look at the performance data as set forth, except for that one installation, which was then removed, it doesn't look as if it actually was performed beyond the Chicago district. That was one of the things, Judge, I wanted to, in fact, bring to the attention of the court. That's why I said before, then, and after. After, it was no question before that the intent of Mr. Weicker was that, but then, after it happened, Mr. Wilson, and the trial record does, in fact, reflect this, through his installations, in phases, and the first phase was to put them within the immediate areas, and would work outward from that. That was his testimony, that I would do this in phases, and so, unfortunately, Mr. Weicker died. That's why I mentioned his death. He died in January 2000. I think it's a fair reading of the transcript. After his death, in fact, occurred, that there was some confusion, and this is why I believe that there was confusion, just from the record. First of all, the following people never talked to Mr. Weicker, nor were they privileged to the conversations with Mr. Porter and Mr. Weicker. Mary, pardon me, Ms. Flynn, Mr. Kubik, Mr. Holmes, and Ms. Infenker. That's the entire lineup that the government presented at trial. None of these individuals ever were aware of the intent, or the meetings, and the Porter, Weicker, and Wilson. So, of course, in January 2000, Mr. Weicker dies. The trial record will reflect, and so does the joint appendix, that as early as the first or second week of January 2000, Mr. Wilson contacted the attorney, Ms. Infenker, about this contract, and during the course of the conversation with her, he told her that he had been given the wider district. This is within a few weeks of the death of Mr. Weicker. Now, I think it's a fair reading of the record. He did that for a purpose, because, obviously, he was still in the process of phasing in what he thought to be the other district. But, Mr. Myers, that's not the finding of the trial court. The trial court found that there was a mutuality of intent, that it only was restricted to the Chicago District. I would respectfully, sir, and most respectfully, in fact, disagree with that. How do we, as an appellate tribunal, dismiss the findings of the lower court, the factual determination? I think that the findings are clearly erroneous, to be very candid, sir. I think they're clearly erroneous, and they are not, in fact, reflective of the record in this case. I don't think there's a basis in it, in the record, for such a finding, and I say that with the utmost deference to Judge Horne. I think she was very patient, very attentive, but at the end of the day, I don't think her finding reflects the facts in the record. And, after Mr. Weicker passed, in January of 2000, this is where the problem came up. The record now reflects that Mr. Holmes and that Mr. Wilson contacted other districts. Judge Horne gives the impression that this somehow indicates that Mr. Wilson never was supposed to go beyond the Chicago district, because he subsequently made these contacts, and I would beg to differ, very respectfully, with Judge Horne on that. Mr. Wilson realized that there was confusion. Mr. Holmes testified he never knew about the conversation between Wilson and Porter and the intent. Ms. Flynn didn't either. Mr. Kubik, who was in charge of the record, did not know about these conversations. Part of the problem, and what the record does reflect, was an incredible bureaucratic confusion throughout, at least, that region of the Postal Service. Nobody seems to have known anything about what anybody else did. Perhaps this matter could have been cleared up most expeditiously, if, in fact, prior to the unfortunate and untimely death of Mr. Weicker, that the agreement that was executed on about October 21 could have been communicated to somebody else. Apparently, that agreement was not communicated to very many people at all, although it was not attached to the original agreement as to the areas. So nobody knew about it. So when Mr. Weicker died, there was this incredible confusion as to what is going on, and everybody now begins to say, well, I don't know what's going on. I don't understand what's going on. Mr. Weicker didn't talk to me. Well, Mr. Weicker wasn't there and couldn't be there to speak for himself. He couldn't be there to say that this was my desire and my wishes. So the closest thing that we came to Mr. Weicker in the living was Mr. Porter. But what I am having trouble with, the bureaucratic confusion, it shines through this record. That seems very clear. A simple contract going on for years. But how does one make a contract, a meeting of the minds, out of this confusion? That's my problem. I think that we have to look to the original intent. And I think Judge Horne, in her opinion, in fact, discusses that. And I believe if you look to the original intent, which is all that we have since attachment A was not there, since Judge Horne found that the record was not and understand circumstantially what happened. If you do that, you have to look at what happened. You have to look at the conduct and the behavior of the actors. And I would bring to the attention of the court one thing that is extraordinarily conspicuous in this record. There's nothing between June of 1999 and October 21 of 1999 by the United States Postal Service that ever says, by way of email, mail, or anything else particularly as to a document, that Mr. Wilson was not to go beyond the Chicago District. In the context of a bureaucracy like the Postal Service, Ms. Flynn testified that she was assigned to work on it, though she was not a contract officer. It is almost incredible that over 200 days of going back and forth on this, not one time did anybody memorialize any document to say that Mr. Wilson was not to go beyond the Chicago District. Then on October 21, which was the day of judgment, the day the contract was executed, nothing was in fact done that day. There was no document that in fact reflected that. Almost incredibly, the attachment, which is highly and signed and executed, and there's confusion into the record as to when people really realized that that was attached. But at the end of the day, everybody admitted, even after the attachment that was attached after the fact, you know, came into being, everybody said that none of them communicated to Mr. Wilson that the attachment was ever in fact given to anybody other than Mr. Porter. Mr. Porter never gave that attachment, claiming that it was limited to the Chicago District, to anybody. Ms. Infanger never gave it to Mr. Wilson. Ms. Flynn never gave it to, in fact, Mr. Wilson. So at the end of the day, up until January 2000, there is not one scintilla other than a post attachment, a unilateral attachment to a document after the execution of the contract reflecting the, in fact, position of the respondent. There's Mr. Weeker dies, and then at the end of the day, the confusion starts because everybody then claims somehow that they didn't know what Mr. Weeker was doing, and I think that that inured to the detriment of my client. Okay, thank you, Mr. Myers. Thank you very much. Mr. Stinson. May it please the Court. There is actually evidence that prior to October of 1999, the Postal Service's intent was that the agreement concerned only the Chicago District, and that is testimony by Mr. Porter in the record and by Ms. Flynn, that Mr. Porter directed the Information Systems Group within his district to gather together a list that listed only the Chicago District telephone numbers, not anything outside the district. So there is evidence prior to the agreement being signed. There's nothing in writing as of October 21st, and it is on that day that the agreement was signed by Ms. Flynn and sent by the Postal Service to Ms. Infeliz, the Postal Service employee, Postal Service attorney, and that list lists only the Chicago District telephone numbers. So there is evidence prior to the actual signing of the agreement that the Postal Service's intent was that it was only going to impact the District of Chicago and not outside. The mutual intent of the parties is established through contemporaneous information that is in the record that arose prior to the dispute arising in this case, and that is the letters that were sent by Mr. Wilson. You're not saying that there's clear mutual intent, you're saying that there was conflicting evidence, right? It's hard to find a mutuality of intent in view of Mr. Wilson's testimony as the principal on that side. The conflicting evidence is on the side of Mr. Wilson's testimony at the trial versus the contemporaneous evidence of the record, the evidence that arose prior to this dispute arising. There is no conflict. If you look back to the 1999 time frame, and what happened both before the contract was signed and then after it was signed, there is evidence that both parties understood this was only a Chicago District agreement and that in order for Gemini to take advantage of other districts within the Postal Service in the Great Lakes region, further agreements had to be entered into. There's testimony in the record by Mr. Porter to that effect. Indeed, the testimony concerning Mr. Weeker, the deceased, it was his intent that Mr. Porter try to assist Gemini to obtain other agreements, but there's nothing that establishes that Mr. Weeker said that this current agreement was for the Postal Service to include the attachment with the contract. It was referred to the contract. It wasn't attached. When apparently it was eventually written, it wasn't sent to the contracting party. This is not a masterpiece of clarity here. I would agree that mistakes were made by the Postal Service in not attaching that attachment A to the agreement at the time it was signed. It was still being prepared at the time it was signed. But aside from that, still, the intent of the parties, if you look to the evidence... It was never provided, apparently. It was discovered. I gather it was never provided. There was no evidence in the record that it was provided to Gemini contemporaneous to the signing of the agreement. Or later. I don't recall that it was provided later. But there is evidence in the record that in June of 2000, a letter was sent by the Postal Service to Ameritech with a copy to Gemini listing the Chicago district telephones only. And that was a letter saying, Dear Ameritech... Did they write to the competitor instead of writing to their of relevance? You can't defend that as a justifiable contracting procedure. I see there are a lot of lawyers involved on the part of the Postal Service, but it doesn't seem as if anybody ever bothered to complete the contract. If you're looking, if you're trying to determine what the mutual intent of the parties was, you're looking to contemporaneous evidence that was generated before the dispute arose. And that June 2000 letter is evidence of that intent because the letter goes to Gemini and there's no response from Gemini saying, wait a second, we have the entire Great Lakes region. We don't just have the Chicago district region. And indeed there's other documents in the record that establish that even Mr. Wilson understood that he did not have anything other than Chicago district. Those are the July 2000 letters that were sent to Mr. Holmes, who's the central district manager for the Postal Service. They talk about looking forward to trying to get some agreement with that district. There's no mention that we already have an agreement with the central district and you need to now implement it. It's talking about future events of trying to come up with an agreement. And indeed the second letter that was sent by Gemini's attorney to Mr. Holmes says here is a template. Here's a template. What we're using is the Chicago district and we suggest that we use this as well. So if you look into what the actions of the parties were prior to when the dispute arose, you'll see that the intent of the Chicago district and not other districts and indeed information that was supplied by Gemini in the district court action that was filed prior to the Court of Federal Claims action. Indeed, it attaches the Chicago district listings only and says that there's affirmative statements in that complaint that says Gemini had an agreement with Chicago district. It doesn't allege, it doesn't say we had an agreement with the Great Lakes region, only the Chicago district. Mr. Stinson, I don't quite understand. It's the four pages, right? That's correct. The Exhibit A could not have been missed by somebody signing the agreement. How can the Postal Service sign off an agreement when it's incomplete? Well, it's not 4,000 pages where an Exhibit A could be lost in the process or otherwise. Very short four page agreement. No Exhibit A. Don't sign it. It's not complete. Well, as you know, there have been a previous mock signing that had happened in September. And this is the actual signing in October. The Postal Service should have included that Exhibit A with the agreement. However, both parties didn't notice it wasn't attached. Mr. Wilson likewise didn't notice it wasn't attached. I don't understand why he signed it, but I don't understand fully why the Postal Service signed off on it without the full, complete agreement in front of it. It would have been beneficial to both parties had that been there and signed once the Exhibit A was attached. But we're faced with the fact that it wasn't. So now we have to define the intent of the parties. And the Court of Proclaims found that the intent of the parties assessing the entire record, both written and testimonial, was that the intent was that the agreement only covered the Chicago District, did not cover the Great Lakes region. And that that finding is not clearly erroneous. And indeed, the plaintiff appellant cannot establish that it was clearly erroneous. There are some statements. Can you tell me why the agreement was signed as an incomplete agreement? Is there anything in the record to show why it was signed as an incomplete agreement? There's nothing that explains why Mr. Porter signed it without the attachment there. I think if it had been made, was he asked during his testimony? I mean, Mr. Porter was still alive and he testified. Was he asked why he signed it? Uh, without an exhibit in that specific way as to why did you sign without being attached? He just didn't realize it wasn't attached. Four pages. No exhibit. A That's correct. It doesn't take that much. That's correct, Your Honor. As I said, would be more beneficial had it been attached. But the bottom line, it was not attached. And so we have to determine close enough for government work, I guess. Well, I beg to differ, Your Honor. I think the government does make an honorable effort to try to do the work that's presented to it. And unfortunately, this one since it did not provide that attachment, but the government does try to do its very best. There were some statements that were made by counsel. I just wanted to point out that evidence does not reflect that those suggestions first. There's a reference that Mr Wilson formed the Chicago attorney for the Great Lakes region as well. There's nothing in the record to establish that that conversation occurred. Indeed, when the Chicago attorney was asked about that during the testimony, um, she when she was asked what she discussed Mr Wilson, that was not top of the discussed. There's nothing in the record to support that. Also regarding what you're telling us is that the evidence is in conflict. This is before email, perhaps if a conversation was not recorded word for word. How do we know it was discussed? Mr Wilson has more of an interest in that conversation and probably the lawyer he talked to. Well, the I'm not certain that the Mr Wilson testified that a trial. My point is that the Chicago train did not. Um, what the court below his face was the fact in that case, there was no conflicting evidence that it was discussed. Yeah. There is. There is the government's position. There is no complete evidence that because it was not discussed between Mr Wilson and Mr and this infant or the U. S. Post attorney said the lawyer didn't. The attorney did not testify. You said no, she did not. She testified that. But what she testified to is that that was not that was not discussed. Okay, I apologize for how I said that. Um, an intent by Mr Weaker that Mr Porter, um, assist Gemini in obtaining the Great Lakes region as well. That was just that intent does not establish a contract here. Um, the Mr Porter's efforts after the agreement was signed are assisted with the intent of Mr Weaker to try to assist Gemini in obtaining for the contracts. He contacted the district manager in both the central district and northern district. And that's that is that is consistent with the testimony regarding what Mr Weaker's intent was for the Chicago Postal Service employee. Mr Porter. Uh, ultimately, this case can also be decided on the fact that Mr Porter only had authority to bind the government as to the district of Chicago. That's an implied actual authority. There's no specific regulation or postal service manual that sets forth specifically that this this individual is a contracting officer or what his authority is as far as signing agreements. But both parties agree that he has implied actual authority to bind the district of Chicago. However, that that that does not reach to the other districts where he has no authority. No further questions. You requested this court firm decision. Thank you, Mr Stinson. Mr Myers, you have a minute or so. If you have a last last word. Okay, thank you. The case is taken under submission. Thank you.